

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-16-2003

# Kwasi Amanfi v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket 01-4477

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Kwasi Amanfi v. Atty Gen USA" (2003). *2003 Decisions.* Paper 506.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/506

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 16, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 01-4477 and 02-1541

KWASI AMANFI,
Petitioner

v.

JOHN ASHCROFT, Attorney General of United States,
Respondent

On Petition for Review of an Order of
the Board of Immigration Appeals
(INS No. A78 424 961)

Argued January 21, 2003

Before: BECKER, *Chief Judge*,* NYGAARD and AMBRO,
*Circuit Judges.*

(Filed: May 16, 2003)

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

SANDRA GREENE, ESQUIRE
 (ARGUED)
238 East Philadelphia Street
York, Pennsylvania 17403

*Counsel for Petitioner*

ROBERT D. MCCALLUM, JR.,
 ESQUIRE
Assistant Attorney General, Civil
 Division
RICHARD M. EVANS, ESQUIRE
Assistant Director
SUSAN K. HOUSER, ESQUIRE
 (ARGUED)
Office of Immigration Litigation
U.S. Department of Justice, Civil
 Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

*Counsel for Respondent*

---

## OPINION OF THE COURT

BECKER, *Circuit Judge.*

In this multi-pronged petition for review of the Board of Immigration Appeal's ("BIA") denial of Kwasi Amanfi's application for asylum, withholding of removal, and protection under the Convention Against Torture, we are primarily presented with the question whether the BIA improperly deviated from its existing interpretation of the Immigration and Naturalization Act's ("INA") definition of a refugee. Amanfi, a native and citizen of Ghana, was detained by immigration officials upon his arrival in the United States after he presented false travel documents. In testimony before the immigration judge, Amanfi stated that he was persecuted by members of a cult and by the Ghanian police on account of their view that he was a homosexual, even though Amanfi did not identify himself as a homosexual and there was no independent evidence that he was.

The BIA recognized the precedents establishing that homosexuals are a protected social group and supporting asylum claims on the basis of imputed political opinion, *i.e.*, when the persecutor believes the applicant has a certain political opinion even though the applicant does not. However, the BIA was unwilling to extend the concept underlying the theory of imputed political opinion — that what matters is the beliefs of the persecutor rather than the persecuted — to Amanfi's theory of imputed membership in a social group (homosexuals) because it deemed such an extension to be without legal precedent.

The INS maintained this position in its brief, but before oral argument it filed a motion to remand this case to the BIA in light of a regulation proposed by the Attorney General in December 2000 that supports Amanfi's theory of imputed membership in a social group. Amanfi notes that in a letter opinion dated January 19, 1993, the INS's General Counsel adopted an interpretation of the INA supporting Amanfi's theory. He nonetheless argues that we should deny the INS's motion and file a precedential opinion in this case because proposed regulations are not binding on the BIA and the INS has never declared when it will promulgate this rule, indeed suggesting at oral argument that it may be quite a long time, perhaps years, before it does so.

While we might remand to the BIA to consider this legal issue in the first instance, we decline to do so here. As we explained in *Johnson v. Ashcroft*, 286 F.3d 696, 700 (3d Cir. 2002), an agency may change its policies, but it cannot depart from its established precedents without explanation. In at least two decisions, the BIA has held that "[p]ersecution for 'imputed' grounds . . . can satisfy the 'refugee' definition" in the INA. *In re S-P-*, 21 I. & N. Dec. 486 (BIA 1996); *see also In re T-M-B-*, 21 I. & N. Dec. 775 (BIA 1997). Moreover, the Attorney General, who is the ultimate authority on interpretations of the INA, INA § 103(a)(1), 8 U.S.C. § 1103(a)(1), explained that the proposed regulation cited by the INS in its motion was not designed to make new law but rather "codifies the existing doctrine of imputed political opinion, as well as the existing administrative interpretation that this doctrine also extends

to the protected grounds other than political opinion." 65 Fed. Reg. 76588, 76592 (Dec. 7, 2000). Because Amanfi's theory of persecution on account of his imputed membership in a social group is supported by these legal precedents, and the BIA did not articulate a reason for deviating from them, we will grant the petition of review to that extent and deny the INS's remand motion. We will, however, remand Amanfi's seriously contested asylum claim to the BIA for consideration of its validity in deference to the BIA's expertise in analyzing the merits of asylum applications.

Finally, we will deny Amanfi's petition for review of the BIA's dismissal of his claim for asylum on the ground of religious persecution, and also his application for protection under the Convention Against Torture. The BIA analyzed the evidence supporting these claims and found that Amanfi did not satisfy his burden of proof. Since we may decline to uphold the BIA's findings of fact only if the evidence compels us to do so, *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.3 (1992), and Amanfi has not identified evidence that would lead us to this conclusion, we will defer to the BIA's determination that Amanfi does not qualify for asylum and withholding of removal on religious persecution grounds or under the Convention Against Torture.

## I.

Kwasi Amanfi is a citizen of Ghana who was detained by the INS at JFK Airport in New York on December 21, 2000, when he attempted to transit through the United States to Canada. He was in possession of a Canadian passport in the name of Ken Oppong. When questioned about his identity by immigration officials, Amanfi at first claimed he was a Canadian citizen but later admitted his real identity and explained that he acquired the passport in Ghana. That same day, the INS served Amanfi with a Notice to Appear charging him with removability under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), as an alien who sought to obtain admission to the United States by fraud or willful misrepresentation of a material fact, and under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an alien seeking admission without a valid document.

In April 2001, Amanfi appeared before an immigration judge ("IJ") and filed, pro se, an application for asylum and withholding of removal under INA §§ 208(a) and 241(b)(3), 8 U.S.C. §§ 1158(a) and 1231(b)(3), and for protection under Article 3 of the Convention Against Torture. In an unsigned attachment to his application, Amanfi stated that he was seeking asylum because of prior abuse by Ghanian authorities on account of his imputed status as a homosexual and alleged torture by a cult that objected to his father's preaching against human sacrifice. At a merits hearing where he was represented by counsel, Amanfi articulated his justification for asylum in testimony summarized as follows.

Amanfi was born in Kumansi, Ghana, and was a member of the Ashanti ethnic group. He had a close relationship with his grandfather who was a "chief" of the Ashanti and who explained to him the group's traditional practices, including human sacrifice. According to what his grandfather told him, homosexuals and other individuals who committed sexual acts that were considered taboo would not be suitable for sacrifice. Although Amanfi's grandfather and other relatives practiced Ashanti traditions, his father was a teacher and minister of a Christian group, as well as a television and radio preacher. Amanfi also identified himself as a Christian. He testified that his father received threats from "macho men" and the "Blood Temple" cult, which objected to his lectures against human sacrifice, and that his father was assaulted by these groups on at least one occasion. In August 2000, Amanfi's father disappeared after he left for church and never returned. Amanfi filed a police report but, despite repeated complaints, received little assistance from the Ghanian authorities in the search for his father.

Shortly thereafter, several men claiming to be police came to Amanfi's house, drove him to an "isolated area," and locked him in a room. The men — whom Amanfi did not actually believe were police, but rather "macho men" who, according to the Department of State country conditions report for Ghana, are private security guards hired by individuals to settle disputes — told him that his father had been killed because of his preaching. The "macho men"

threatened Amanfi with the same. He testified that the room in which he was kept contained a fetish, or idol, that was covered with blood, which he suspected was from his father. His captors brought him food and wine, which Amanfi claimed meant they were preparing him for sacrifice. He based this assumption on teachings from his grandfather about the purification process that occurs before an individual may be sacrificed.

Another person was brought into the room where Amanfi was detained. Amanfi informed this man, who was named "Kojo," that they could save themselves from being sacrificed if they engaged in homosexual behavior because, according to his granfather, homosexuals were unacceptable for sacrifice. Even though Amanfi stated that he was not a homosexual, he engaged in a homosexual act with Kojo and was discovered by his captors. Several of the "macho men" took him and Kojo outside and beat them before bringing them to the police station. At the station, the police informed the public that Amanfi and Kojo were homosexuals, and Amanfi stated that a "big crowd" came to look at them because they were naked and he feared that he would be attacked. He explained that he knew from witnessing prior public torture of homosexuals that his life was endangered.

Amanfi averred that the police beat him and Kojo daily until Kojo died when he fell and a policeman "stepped on his testicles." After more than two months of such treatment in police custody, Amanfi managed to escape when the station was largely empty due to the need for police coverage at polling places on an election day. He then hitchhiked to Accra, the capital of Ghana, where he sought refuge at his cousin's home. The cousin refused to let Amanfi stay at her home, however, because his reputation as a homosexual had drawn "a lot of attention" and she was concerned about retribution from local chieftains and her family. Instead, Amanfi stayed in a hotel. His cousin visited him until she received a correspondence from the police stating that they were looking for him. With her help, Amanfi went to the airport where an individual Amanfi called an "immigration officer" provided him with a Canadian passport bearing the name "Ken Oppong" and

placed him on a flight to JFK. Amanfi explained that he only sought transit through the United States to Canada in order to petition the Canadian authorities for asylum.

The IJ admitted a number of exhibits into the record, including the Department of State's country report on Ghana and its 1996 Profile of Asylum Claims for Ghana; the United Kingdom's country report on Ghana; a notarized document from a woman identifying herself as a cousin of Amanfi; the 1999 and 2000 reports from Amnesty International; and the 2001 report from Human Rights Watch on conditions in Ghana. Following the hearing, the IJ found Amanfi subject to removal under INA § 212(a)(7)(A)(i)(I), for seeking admission without a valid document, but dismissed the charge of fraud under INA § 212(a)(6)(C)(i) for lack of prosecution.

The IJ also concluded that Amanfi's testimony was not credible. Noting that Amanfi had failed to present corroborating evidence of the practice of human sacrifice in Ghana and had initially told a different story to INS officials, the IJ concluded that Amanfi was actually an illegal resident of Canada and had fabricated his current testimony while in detention. For this reason, the IJ denied Amanfi's petition for asylum, withholding of removal, and protection under the Convention Against Torture.

Amanfi appealed to the BIA, arguing that the IJ erred in denying his application for withholding of removal and asylum, which was grounded on his fear of persecution as a homosexual if he were returned to Ghana. The BIA dismissed Amanfi's petition, reasoning that he could not meet his burden of proof under the INA that he had a well-founded fear of persecution in Ghana on account of a protected ground. The BIA concluded that Amanfi's treatment by the "macho men" who kidnaped him was based on a private dispute involving his father's ministry. The BIA also explained that Amanfi cannot qualify as a member of a "particular social group" as a homosexual, a protected social group according to *Matter of Toboso-Alfonso*, 20 I. & N. Dec. 819 (BIA 1990), because he testified that he was not in fact a homosexual. Since it determined that Amanfi failed to meet his burden of proof

for the asylum application, the BIA specifically declined to address the IJ's adverse credibility determination.

Amanfi filed a motion for reconsideration in which he raised several arguments: first, that the dispute with the "macho men" was not merely personal because it concerned his and his father's religious beliefs; second, that the BIA should have considered whether the "macho men" and the Ghanian authorities persecuted him because they believed he was a homosexual, even if he was not actually a member of this social group; and third, that his past persecution by Ghanian authorities indicates that it is more likely than not that he will be tortured upon return to Ghana, a requirement for protection under the Convention Against Torture. The BIA did not find these arguments persuasive and denied Amanfi's motion. With regards to the first and last arguments, the BIA reiterated its conclusion that Amanfi did not present sufficient evidence to qualify for asylum on account of religious persecution or protection under the Convention Against Torture based on the supposed likelihood that he would be tortured if returned to Ghana.

The BIA also described as being without "any legal precedent" Amanfi's argument that his claims should be analyzed from the perspective of his *imputed* status as a homosexual rather than *actual* membership in this social group. While the BIA acknowledged that some courts have recognized that an imputed *political opinion* "can exist whatever the asylum seeker's actual political opinion may be," it opined that these cases do not "support a finding that 'imputed' membership in a particular social group supports a grant of asylum relief."

Amanfi filed petitions for review of both BIA decisions, which were consolidated into this appeal. He also submitted an emergency motion for stay of his removal, which we denied. At oral argument, Amanfi's counsel stated that Amanfi had been removed by the INS to Ghana. We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1) to review final orders of removal.[1] Our standard of review of the BIA's

---

1. The removal of Amanfi before this court rendered a judgment did not moot his petition for review of the BIA's order of removal. *See Chong v.*

findings of facts is quite deferential. While we must ascertain whether the BIA's factual determinations are supported by substantial evidence, *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998), only if the evidence compels otherwise may we decline to uphold these findings. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.3 (1992).

## II. Convention Against Torture

Article 3 of the Convention Against Torture, as implemented by INS regulations, prohibits removal of an alien to a country when the alien sustains his burden of proving that it is more likely than not that he will be subject to torture by, at the instigation of, or with the acquiescence of a public official. *See* 8 C.F.R. §§ 208.16(c) and 208.18(a); *Matter of S-V-*, 22 I. & N. Dec. 1306 (BIA 2000). A petition for protection under the Convention Against Torture differs significantly from petitions for asylum or withholding of removal because the alien need not demonstrate that he will be tortured on account of a particular belief or immutable characteristic. *Matter of S-V-*, *supra*. Rather, in assessing whether an alien is more likely than not to be tortured in the proposed country of removal, INS regulations identify a non-exclusive list of factors to consider: (1) evidence of past torture inflicted on the alien; (2) the possibility the alien could relocate to another part of the country where his torture is unlikely; (3) evidence of "gross, flagrant or mass violations of human rights" in the country; and (4) any other relevant country conditions information. 8 C.F.R. § 208.16(c)(3).

Amanfi contends that the BIA erred when it denied his petition for protection under the Convention Against Torture because it allegedly overlooked evidence supporting his claim. Without specific citation, Amanfi claims that the record "shows that Ghanian police have a history of inflicting human rights abuses upon individuals in its

---

*Quarantillo*, 264 F.3d 378, 385 (3d Cir. 2001) (holding that "the [BIA's] order of removal creates sufficient collateral consequences to render [the alien's] petition a live case or controversy by preventing [the alien] from entering the United States for ten years" pursuant to 8 U.S.C. § 1182(a)(9)(A)(ii)).

custody." He also argues that because he was tortured by the police while in their custody, there is a high probability that he would be tortured if returned to Ghana. Similarly, Amanfi contends that the police would acquiesce in any further torture he experienced at the hands of the "macho men."

The INS responds that the record does not present any compelling evidence that would undermine the BIA's finding that Amanfi is not likely to be subject to torture should he be returned to Ghana. It points to the country condition report compiled by the U.K. Home Office stating that there is religious toleration in Ghana, a country whose population is approximately 40% Christian. The Home Office's report also notes that while homosexuality is illegal in Ghana, the law is not strictly enforced and homosexuality is generally tolerated. Further, the reports compiled by the U.S. Department of State, Amnesty International, and Human Rights Watch do not mention torture or mistreatment of homosexuals. While there is evidence in the country condition reports of police brutality and arbitrary detention, there is nothing supporting the claim that Ghanaian authorities routinely commit "gross, flagrant or mass violations of human rights," a factor militating in favor of protection under the Convention Against Torture. 8 C.F.R. § 208.16(c)(3)(iii).

The INS further notes that although the BIA did not affirm the IJ's determination that Amanfi's testimony was not credible, it also did not find any evidence corroborating his story. The INS properly contends that while "evidence of past torture inflicted upon the applicant" is a factor in determining whether an alien qualifies for protection under the Convention Against Torture, 8 C.F.R. § 208.16(c)(3)(i), it is not, in and of itself, dispositive of such a claim. Amanfi's testimony about his past torture therefore cannot *compel* the conclusion that it is more likely than not that he will be tortured again when removed to Ghana.

Finally, the INS emphasizes the State Department's explanation that the "macho men" are private actors not associated with the government of Ghana. Their actions alone, therefore, cannot sustain a petition under the Convention Against Torture. However, a claim is possible if

it is more likely than not that a public official will acquiesce in torture by private actors. 8 C.F.R. § 208.18(a)(1). In order to establish that Ghanian authorities would acquiesce in torture committed by the "macho men," Amanfi must prove that the officials would have awareness of this torture but "thereafter breach his or her legal responsibility to intervene to protect such activity." 8 C.F.R. § 208.18(a)(7). Amanfi failed to present any evidence to sustain this burden of proof.

We essentially agree with the INS on this issue. Because we do not find that the evidence in the record compels the conclusion that Amanfi qualifies for protection under the Convention Against Torture, we must deny his petition for review of this claim.

## III. Asylum and Withholding of Removal

The key element that must support a petition for asylum and withholding of removal is the existence or fear of persecution, committed by either private or state actors, on account of a belief or an immutable characteristic. To qualify for asylum, an alien must show persecution, or a well founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. INA §§ 101(a)(42)(A) and 208(a), 8 U.S.C. §§ 1101(a)(42)(A) and 1158(a); *Elias-Zacarias*, 502 U.S. at 481–82. The standard for withholding of removal is slightly different. In order to successfully assert such a petition, an alien must show that if returned to his country, it is more likely than not that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. INA § 241(b)(3), 8 U.S.C. § 1231(b)(3); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987).[2]

---

2. While the standard for withholding of removal is similar to the qualifications for protection under the Convention Against Torture, we do not believe that our denial of Amanfi's petition for review of his Convention Against Torture claim automatically requires us to deny review of his withholding of removal claim. This is because a claim for protection under the Convention Against Torture requires proof of the likelihood that government officials will commit or acquiesce to torture of

Amanfi contends that he was persecuted in Ghana by the "macho men" on account of his religion and by both the "macho men" and the Ghanian police because of his imputed status as a homosexual. The BIA analyzed these claims separately. On the issue of religious persecution, the BIA reviewed the evidence and concluded that Amanfi had failed to present evidence suggesting that his treatment by the "macho men" was motivated by anything more than a personal dispute regarding his father's ministry. As to the question of persecution on account of Amanfi's imputed status as a homosexual, the BIA declined to analyze the facts supporting this claim because it determined that there was no "legal precedent" endorsing this theory of persecution. Since we employ different standards of review of the BIA's findings of fact and interpretation of the INA, we too will address these claims separately.

## A.    Claim of Persecution on Account of Religion

Amanfi does not dispute the BIA's finding that his persecution at the hands of the "macho men" involved a personal dispute with his father's ministry. He argues, however, that the BIA should have analyzed his petition under the "mixed motives" framework articulated in *In re S-P-*, 21 I. & N. Dec. 486 (BIA 1996), which held that an alien need only prove that the persecutor was motivated in significant part by a protected characteristic. The BIA recognized its precedent in *In re S-P-*, *supra*, but specifically stated that the "mixed motive" analysis was unsupported by the facts in this case because Amanfi did not provide "any evidence supporting his assertion that he has been persecuted 'on account of' his own religion."

Although religion was indeed part of his testimony, Amanfi testified that he was persecuted because his father

the alien; by contrast, an alien seeking withholding of removal must allege the likelihood of persecution on account of a protected ground by either public officials or private individuals. These slight but significant differences, *e.g.,* torture versus persecution and government officials compared with both public and private actors, necessitate separate analyses of these claims. These matters will have to be developed on remand.

had spoken out against the practices of the "macho men," including fetish worshiping and human sacrifice, not due to his own faith. Thus, even though religion, or at least the beliefs of the "macho men," was a circumstance in Amanfi's persecution, the record shows that it was retaliation against his father's preaching — and not Amanfi's or his father's belief in Christianity — that was the motivating factor behind his persecution. The mention of religion in the fabric of the story is insufficient to establish a persecution claim because, as the Supreme Court noted in *Elias-Zacarias*, the mere existence of a generalized motive underlying persecution cannot establish the proposition that the alien fears persecution on account of that motive. 502 U.S. at 482. The evidence does not establish that Amanfi was persecuted, or has a well-founded fear of persecution, on account of his religious faith.

Since we have a very deferential standard of review of the BIA's findings of fact and may only reverse these findings if the evidence compels us to do so, *see id.* at 481 n.3, we must affirm the BIA's conclusion that Amanfi was not persecuted on account of his religion, but rather because of retaliation in response to a personal dispute involving his father. It is not claimed that this is a ground for asylum and withholding of removal.

### B. Claim of Persecution on Account of Imputed Status as a Homosexual

#### 1. Did the BIA Depart from the INS's Interpretation of the INA?

Amanfi contends that his persecution by the "macho men" and the Ghanian police on account of their belief that he was homosexual, even though he is not homosexual, qualifies as persecution on account of membership in a social group within the meaning of INA §§ 101(a)(42)(A) and 241(b)(3). Noting that the BIA and several Courts of Appeals have held that an alien may qualify for asylum because of imputed political opinion, Amanfi argues that a similar interpretation of the INA should apply for imputed membership in a social group. The BIA summarily

dismissed Amanfi's argument, stating that while homosexuals are a protected social group, *see Matter of Toboso-Alfonso, supra*, there is no "legal precedent" supporting the doctrine that asylum may be granted because of imputed membership in a social group.

The INS maintained this position in its brief. However, before oral argument, it moved to remand the case to the BIA because of the pendency of a proposed regulation that addressed this issue and adopted Amanfi's view. The proposed regulation, which has not yet been promulgated, states in relevant part:

> An asylum applicant must establish that the persecutor acted, or that there is a reasonable possibility that the persecutor would act, against the applicant on account of the applicant's race, religion, nationality, membership in a particular social group, or political opinion, or *on account of what the persecutor perceives to be the applicant's* race, religion, nationality, *membership in a particular social group*, or political opinion.

65 Fed. Reg. 76588, 76597–98 (Dec. 7, 2000) (proposed rule 8 C.F.R. § 208.15(b)) (emphasis added). The INS argued that in light of this proposed rule, a remand is warranted because "the adjudication of the instant case would be facilitated if the BIA addressed how the policy expressed in the proposed regulation affects this case."

In response, Amanfi agreed that the case should be remanded to the BIA, but he also argued that we should issue a precedential opinion because: (1) a proposed rule is not binding on the BIA; (2) the regulation was proposed more than two years ago and has not yet been promulgated; (3) the INS has not indicated when this promulgation would occur; and (4) this rule is reflective of an opinion letter issued by the INS's General Counsel's Office in 1993, *see* INS General Counsel Opinion Letter, Genco Op. No. 93-1, 1993 WL 1503948 (Jan. 19, 1993), which is summarized in the margin.[3]

---

3. The opinion letter explained the INS's General Counsel's position that "[p]ersection inflicted because the persecutor erroneously imputes to the

When reviewing the BIA's interpretation of the INA, we must apply the principles of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999). We have held that "[a]lthough an agency can change or adapt its policies, it acts arbitrarily if it departs from its established precedents without 'announcing a principled reason' for the departure." *Johnson v. Ashcroft*, 286 F.3d 696, 700 (3d Cir. 2002) (quoting *Fertilizer Inst. v. Browner*, 163 F.3d 774, 778 (3d Cir. 1998)). We further explained that if the INS "departs from an announced rule without explanation or an 'avowed alteration,' such action could be viewed as 'arbitrary, capricious, [or] an abuse of discretion.' " *Id.* (quoting *INS v. Yang*, 519 U.S. 26, 32 (1996)).

Before we may determine whether the INS departed from an established precedent, it is necessary to specify what INS authorities are charged with interpreting the INA. According to the INA, the Attorney General "shall be charged with the administration and enforcement" of the statute, and the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA § 103(a)(1), 8 U.S.C. § 1103(a)(1). The Supreme Court has explained that "[t]he Attorney General, while retaining ultimate authority, has vested the BIA with power to exercise the 'discretion and authority conferred

---

victim one of the protected characteristics set forth in Section 101(a)(42) can constitute persecution 'on account of' that characteristic for the purpose of asylum or refugee analysis." Genco Op. No. 93-1, 1993 WL 1503948 (Jan. 19, 1993). It further noted that this "view is consistent with both the plain language of the statute and its settled administrative interpretation." *Id.* General Counsel emphasized that its interpretation of the INA applied to all five protected characteristics equally and that there was no logical reason for differentiating, for example, between imputed political opinion and imputed membership in a social group. General Counsel also explained that this view is supported by the text of the INA, in which the "on account of" language, which refers to the persecutor's motivation and perspective, precedes "political opinion" as well as the four other protected grounds, including "membership in a social group," INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A), and thus applies to each protected ground equally.

upon the Attorney General by law' in the course of 'considering and determining cases before it.'" *Aguirre-Aguirre*, 526 U.S. at 425 (quoting 8 C.F.R. § 3.1(d)(1)). The Court has also stated that BIA decisions give ambiguous terms in the INA "concrete meaning through a process of case-by-case adjudication." *Cardoza-Fonseca*, 480 U.S. at 448.

In at least two decisions issued subsequent to the INS's opinion letter, the BIA adopted a rule that is contrary to its conclusion in this case that Amanfi's theory of imputed membership in a social group is without legal precedent. For example, in *In re S-P-, supra*, the BIA stated that "[p]ersecution for 'imputed' grounds (*e.g.*, where one is erroneously thought to hold particular opinions or mistakenly believed to be a member of a religious sect) can satisfy the 'refugee' definition." Similarly, in *In re T-M-B-*, 21 I. & N. Dec. 775 (BIA 1997), the BIA explained that in order to qualify for asylum "the applicant must produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or imputed protected ground." Moreover, while this court and other Courts of Appeals have not considered the specific issue of imputed membership in a social group, there is wide endorsement of the concept of persecution on account of imputed political opinion, *see Lukwago v. Ashcroft*, No. 02-1812, slip op. at 31 (3d Cir. May 14, 2003), and the other cases set forth in the margin.[4]

---

4. *Lukwago*, No. 02-1812, slip op. at 31 ("We have held that '[t]he persecution may be on account of a political opinion the applicant actually holds or on account of one the foreign government has imputed to him.'") (quoting *Balasubramanrim v. INS*, 143 F.3d 157, 165 n.10 (3d Cir. 1998)); *see also Al Najjar v. Ashcroft*, 257 F.3d 1262, 1289 (11th Cir. 2001) (acknowledging that proof of an imputed political opinion would have qualified as persecution "on account" of political opinion under the INA); *Morales v. INS*, 208 F.3d 323, 331 (1st Cir. 2000) ("There is no doubt that asylum can be granted if the applicant has been persecuted or has a well-founded fear of persecution because he is erroneously thought to hold a particular political opinion."); *Lwin v. INS*, 144 F.3d 505, 509 (7th Cir. 1998) ("One way that an applicant can establish 'political opinion' under the INA is to show an imputed political opinion."); *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997) ("If the

The BIA's conclusion in this case that Amanfi's argument is without "legal precedent" therefore appears directly to contravene these BIA decisions that apply the concept of imputation to all five protected grounds. More importantly, the Attorney General, in commentary to the proposed regulation cited in the INS's motion and quoted above, stated that the new rule was not designed to change the law but rather "codifies the existing doctrine of imputed political opinion, as well as *the existing administrative interpretation that this doctrine also extends to the protected grounds other than political opinion.*" 65 Fed. Reg. 76588, 76592 (Dec. 7, 2000) (emphasis added).

In its original order and in the subsequent order denying Amanfi's motion for reconsideration, the BIA did not discuss or follow its own decisions nor did it acknowledge the Attorney General's explanation of the "existing administrative interpretation" of the INA, all of which are legal precedents supporting Amanfi's theory of persecution on account of imputed membership in a social group. Because the Attorney General and the BIA are charged with interpreting the INA and the BIA in this case has departed "from [the INS's] established precedents without 'announcing a principled reason' for the departure," *Johnson*, 286 F.3d at 700, we do not believe that it is necessary to remand this legal issue to the BIA. We therefore hold that persecution "on account of" membership in a social group, as defined in INA §§ 101(a)(42)(A) and 241(b)(3), includes what the persecutor perceives to be the applicant's membership in a social group, and will grant the petition for review to this limited extent and deny the INS's remand motion.

---

persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion and required under the Act."); *Cruz-Diaz v. INS*, 86 F.3d 330, 332 (4th Cir. 1996) (denying applicant's petition for review based on the finding that "[t]he evidence does not compel the conclusion that [the applicant] will be subjected to persecution or other harm based on actual or imputed opinion").

## 2. Remedy

Because the BIA dismissed Amanfi's claim on legal grounds, it did not analyze whether the evidence supports his theory of persecution on account of imputed status as a homosexual, a matter which is contested by the INS. We must therefore defer to the BIA's expertise in evaluating petitions for asylum and withholding of removal, and remand this case to the BIA for further consideration of Amanfi's claim. *See INS v. Ventura*, 123 S. Ct. 353, 355 (2002) ("A court of appeals 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.' ") (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)); *Gallius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998) (noting that remand "is the appropriate remedy when a reviewing court cannot sustain the agency's decision because it has failed to offer legally sufficient reasons for its decision"); *Rhoa-Zamora v. INS*, 971 F.2d 26, 34 (7th Cir. 1992) ("We will not weigh evidence that the [BIA] has not previously considered; an appellate court is not the appropriate forum to engage in fact-finding in the first instance.").

In doing so, the BIA may choose to reach the merits of Amanfi's claim or it may decide to discredit his testimony, as the IJ did, in which case there will be little evidence to support the petition. This is, of course, a matter for the BIA to decide *de novo*. *See Damaize-Job v. INS*, 787 F.2d 1332, 1338 (9th Cir. 1986) (articulating the Court's "practice to remand to the [BIA] for credibility findings whenever we reverse a [BIA] decision in which the [BIA] has expressly abstained from deciding the credibility issue.").

For the foregoing reasons, we will deny Amanfi's petition for review on his claims for protection under the Convention Against Torture as well as his asylum and withholding of removal claims on account of religious persecution. We will grant the petition for review only on the legal issue of Amanfi's application for asylum and withholding for removal because of persecution by the "macho men" and Ghanian authorities on account of his imputed status as a homosexual and we will remand to the BIA for further proceedings.

19

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*