

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-21-2004

# Manukyan v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2358

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Manukyan v. Atty Gen USA" (2004). *2004 Decisions.* Paper 797.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/797

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-2358

———————

ARMEN MANUKYAN;
ANAHIT MANUKYAN;
SONA MANUKYAN,
Petitioners

v.

JOHN ASHCROFT,
Attorney General of the
United States of America,
Respondent

———————

On Petition for Review of an Order of the
Immigration and Naturalization Service
Board of Immigration Appeals
(BIA Nos. A78-204-492, A-78-204-493
and A78-204-494)

———————

Submitted Under Third Circuit LAR 34.1(a)
April 12, 2004

Before:  RENDELL, COWEN and LAY*, Circuit Judges.

(Filed   April 21, 2004 )

———————

*Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by
designation.

## OPINION OF THE COURT

RENDELL, <u>Circuit Judge</u>.

Petitioner Armen Manukyan, his wife Anahit, and his daughter Sona, all citizens of Armenia, challenge the final order of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") denial of their applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252(a). We will deny the petition.

Mr. Manukyan testified at length, and we recount here the salient portions of his testimony. Mr. Manukyan was born in Armenia. After finishing college, he worked for the Armenian government as a railroad engineer. In 1991, while on a business trip to Moscow, he met a group of Jehovah's Witnesses who were handing out literature. In February of the next year, Mr. Manukyan attended a Jehovah's Witnesses meeting in Armenia.

That May, when Mr. Manukyan and his wife were leaving the home of another Jehovah's Witness where a meeting had been held, Mr. Manukyan was arrested. He testified that he was arrested because he was holding religious books, which the police confiscated after stating that the books were prohibited in the country. Mr. Manukyan further testified that he was struck in the head by police officers at the station. The police released Mr. Manukyan after several hours and told him that if he continued to study the

2

Jehovah's Witness religion, he would be arrested again. Before leaving the station, Mr. Manukyan was asked to sign a blank piece of paper, which he did.

Four months after the first arrest, Mr. Manukyan was arrested again, this time in his home during a meeting of the Jehovah's Witnesses. Once again, he was taken to the police station, where he was told that, in signing the blank paper presented to him during his first visit to the station, he had vowed not to study the Jehovah's Witness religion any longer. According to Mr. Manukyan, the police also hit him in the mouth as punishment for breaking his promise not to study the religion. Mr. Manukyan testified that as a result, he suffered broken teeth, a broken jaw bone, and a broken bone in his chest. Mr. Manukyan stated that he did not seek treatment at a hospital for his injuries because he would have been forced to file a complaint against the government for his injuries.

In 1996, Mr. Manukyan was arrested a third time, allegedly for his continued involvement with the Jehovah's Witnesses. This arrest also took place during a Jehovah's Witnesses meeting at his home. Mr. Manukyan testified that this time, he was struck accidentally by the police officers, which caused him to fall to the ground. Once Mr. Manukyan was on the ground, the police officers hit him again on the right side of his groin. He testified that he sustained an abdominal cut after the incident, but once again did not seek treatment at a hospital.

Mr. Manukyan left Armenia with his daughter on April 17, 1997, and both came to the United States on tourist visas. He continued to study and practice as a Jehovah's

3

Witness and was eventually baptized in New York. A few months later, Mr. Manukyan's wife also arrived in the United States. They applied for asylum, withholding of removal, and CAT relief in January of 2000.[1]

After the hearing regarding their claims, the IJ denied the petitions. In his decision, the IJ noted that the claim for asylum was time-barred because it was filed more than a year after petitioners' entry into the United States.[2] 8 U.S.C. § 1158(a)(2)(B). The IJ denied petitioners' other applications for relief from removal and for voluntary departure on the merits. The IJ based his decision on inconsistencies in the testimony of Mr. Manukyan and his wife, discrepancies between the application for asylum and Mr. Manukyan's testimony at the hearing, and a lack of any indication in the Country Reports for Armenia that Jehovah's Witnesses suffered the type of abuse described by Mr.

---

The Attorney General may not remove a person to a country where that person's "life or freedom would be threatened" as a result of his or her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To qualify for withholding of removal, Mr. Manukyan must "establish a clear probability of persecution" if he were to return to his home country. INS v. Stevic, 467 U.S. 407, 412 (1984). This standard requires the petitioner to show that "it is more likely than not that [his] life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion" if he should return to his home country. Amanfi v. Ashcroft, 328 F.3d 719, 726 (3d Cir. 2003). If Mr. Manukyan can show past persecution on one of these bases, there is a presumption that his "life or freedom would be threatened in the future in the country of removal." 8 C.F.R. § 208.16(b)(1)(I).

The IJ indicated that petitioners failed to offer any evidence indicating that the statutory time limit should be waived in their case. See 8 U.S.C. §§ 1158(a)(2)(D) (allowing for the consideration of otherwise untimely petitions due to changed or extraordinary circumstances). Because petitioners do not explore this issue in their brief, we will not examine it here.

4

Manukyan. The IJ also noted that, even assuming all of the evidence was credible, he would still deny the applications because there was no evidence that petitioners "suffered persecution as defined for one of the five statutory reasons," nor was it "more likely than not that any of the [petitioners] would be persecuted upon returning to Armenia." Finally, the IJ found that petitioners had not demonstrated a well-founded fear of persecution if sent back to Armenia.[3]

The BIA summarily affirmed the IJ's decision on April 9, 2003. On appeal, Mr. Manukyan contends that the IJ incorrectly required documentary evidence to support the claims for relief from removal, and that there was not substantial evidence supporting the IJ's finding that Mr. Manukyan's testimony was not credible.

Because the BIA affirmed without opinion, the IJ's decision becomes the final order for purposes of our review. 8 C.F.R. § 1003.1(e)(4). We review the IJ's decision under the deferential substantial evidence standard. Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003). This standard requires that "the administrative findings of fact are

---

With respect to the applications for voluntary departure, the IJ concluded that the lack of documentary evidence that police in Armenia arrest and physically hurt people because they are Jehovah's Witnesses demonstrated that Mr. Manukyan's and his wife's testimony were "totally manufactured." The IJ determined that, having given such fabricated testimony under oath, Mr. Manukyan and his wife were "not persons of good moral [character] pursuant to Section 101(f)(6)" of the INA, and were therefore ineligible for voluntary departure. Because petitioners do not treat this issue separately in their brief, and because we affirm the IJ's determinations underlying his denial of voluntary departure, we will not comment on this issue any further.

5

conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Substantial evidence is defined as "more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998) (citation omitted).

After carefully reviewing the administrative record, we find that substantial evidence supports the IJ's denial of Mr. Manukyan's applications for withholding of removal. The IJ determined that Mr. Manukyan's testimony was not credible because it was inconsistent with his wife's testimony, with the asylum application, and with the conditions described in the Country Report. The IJ found Mr. Manukyan's testimony that he was severely injured by police officers on more than one occasion, but never sought treatment at a hospital, to be unbelievable. The IJ also noted that a doctor's report provided by the INS did not reveal any sign of severe trauma to Mr. Manukyan's head, belying Mr. Manukyan's assertions that he suffered a broken jaw as a result of one of the alleged beatings. The IJ concluded that, had Mr. Manukyan's jaw actually been broken, some indication of that fact would have appeared in the medical report.

The IJ also noted a discrepancy between Mr. Manukyan's testimony and his asylum application with respect to his employment. While Mr. Manukyan stated on his application that his place of employment was with an Armenian railroad company until 1997, his testimony indicated that he was fired from the railroad in 1994 and ran a shoe

6

business until 1997. Mr. Manukyan was unable to explain this discrepancy. The IJ also found it to be problematic that, although Mr. Manukyan described a severe facial injury, he also indicated that his co-workers did not inquire why he had missed work for 17 days, nor did they notice any facial abnormalities that would accompany a broken jaw.

Next, the IJ noted inconsistencies between Mr. Manukyan's testimony and the testimony given by his wife. She testified that Mr. Manukyan returned home from jail with pain in his chest and broken teeth, but never mentioned a broken jaw. Further, she testified that her mother, who is a doctor, treated Mr. Manukyan for his injuries, but Mr. Manukyan testified that he was never treated by a doctor for any of those injuries. The IJ also noted that Mrs. Manukyan stated that she and her husband had attended two meetings with Jehovah's Witnesses without incident after Mr. Manukyan's alleged beating for his involvement with that group. Additionally, the IJ disbelieved Mrs. Manukyan's testimony that she was not arrested with her husband simply because she was a woman and therefore could not be treated as harshly, even though she was engaged in the same practices as her husband.

Finally, the IJ concluded that the documentary evidence presented did not support the petitioners' claims that they were mistreated by the Armenian police for being Jehovah's Witnesses, as the Country Reports failed to indicate that the Armenian police commonly engage in this practice against Jehovah's Witnesses simply for practicing their religion. The only incidents where Jehovah's Witnesses were targeted for any reason

7

involved men refusing to respond to the government's military draft, which is not the case here. Contrary to petitioners' assertions before us, the IJ did not require documentation corroborating aspects of petitioners' story; he simply indicated that the Country Report did not lend support to their account or counteract the credibility problems listed above.

We are convinced that the combination of these observations by the IJ provide more than enough support for his denial of petitioners' applications. Petitioners did not meet their burden of proof by showing, through credible evidence or testimony, that it was more likely than not that they would be persecuted for being Jehovah's Witnesses if they were to return to Armenia. Accordingly, we will DENY the petition for review of the IJ's decision.

---