

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-2006

# Hong v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Hong v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1596.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1596

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 04-3000

_____

HONG HONG,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES;
DEPARTMENT OF HOMELAND SECURITY,
Respondents

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
No. A76-280-678
Immigration Judge:  Hon. Rosalind K. Malloy

_____

Argued December 12, 2005

BEFORE:  SLOVITER, SMITH and STAPLETON,
Circuit Judges

(Opinion Filed February 13, 2006)

_____

Mark T. Knapp (Argued)
Abigail D. Flynn-Kozara
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA  15219
 Attorneys for Petitioner

Peter D. Keisler
Donald E. Keene
Douglas E. Ginsburg
Lyle D.Jentzer
Alison R. Drucker (Argued)
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878 - Ben Franklin Station
Washington, DC  20044
  Attorneys for Respondent

---

OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

Petitioner Hong Hong ("Hong") is a native and citizen of the People's Republic of China.  He petitions for review of a Board of Immigration Appeals ("BIA") decision denying his asylum, withholding of removal, and relief under the United Nations Convention Against Torture Act.

According to the Western Calendar, Hong was 15 years old when he illegally emigrated from China.  He testified that he left China because his family was destitute, and he wanted a better education and a better life in America.  To enable him to reach the United States, his mother contacted a member of a criminal smuggling organization – the "Snakeheads" – and arranged passage on a boat to Guam.  The boat left China in mid-

2

April of 1999, carrying 150 individuals of which approximately a dozen were, like Hong, children. After a journey of approximately 13 days, the boat was stopped at the border of Guam by U.S. authorities.

Hong testified that after the boat was stopped he cooperated with U.S. officials in identifying those involved in smuggling him into the country. Hong was told that he would be a witness for the government. In September of 1999, Hong was reinterviewed by U.S. investigators and learned that the smugglers had pled guilty.

Hong was among several aliens captured on the boat who offered testimony regarding the smugglers. Frederick Black, the U.S. Attorney for the District of the Northern Marina Islands, has stated that the testimony of Hong and others was "critical" to the United States's case:

> [T]he five Material Witness were the key percipient witnesses that the United States intended to call if the case went to trial. Their statements to the [INS authorities], and their willingness to testify at trial, were the primary reason that all four defendants in this matter were convicted and sentenced.

App. at 145.

The essence of Hong's claim is that he fears returning to China because the Snakeheads are looking for him. At his immigration hearing, Hong supported that claim by attempting to submit a letter from his mother to an uncle in the United States in which she describes how the Snakeheads had visited her trying to ascertain Hong's whereabouts.

I.

The IJ found Hong to be a "quite credible" witness based on his testimony about his reasons for leaving China and his fear of the Snakeheads. The IJ also found "sufficient information" in the record to support the conclusions:

> that the Snakeheads are indeed a powerful criminal gang operating internationally, that they are capable of bribing and corrupting officials in [the] People's Republic of China, as well as officials in other countries. . . . [Respondent's subjective fear of the Snakeheads] is based on objective, if there is an objective basis because . . . these Snakeheads have contacts, have influence, and the government of China cannot control their activities. . . . the Court believes that there is an objective basis to the respondent's fear of returning [to China].

App. at 22-23. The IJ dismissed Hong's claim to asylum based on "past persecution" and rejected the idea that Hong's asylum claim could rest on his political opinion, but she did find that he could qualify on one of the statutory grounds for asylum based on a fear of future persecution:

> In trying to determine what's the basis for an asylum grant will be in this case and looking at the five grounds for asylum, the Court only placed the respondent in the category of membership in a particular social group. Now, this would be stretching the definition of that particular category. But since the Court has no, there are no precedent decisions regarding juveniles and applying for asylum, at least that this Court is aware of, here we have a juvenile who informed on a criminal gang.

App. at 21. Finding that Hong was likely to be detained if he returned to China and accessible in that detention to Snakehead representatives, the IJ granted Hong asylum. She denied Hong's petitions for withholding of removal and protection under the

Convention Against Torture Act.[1]

     The BIA reversed the IJ's grant of asylum. Its explanation was as follows:

     In order to establish eligibility for asylum, the respondent must establish a well-founded fear of persecution on account of his race, religion, nationality, membership in a particular social group, or his political opinion. The Immigration Judge found the respondent established that his fear was based on his membership in a particular social group, juvenile informants against international alien smuggling rings. We disagree. Membership in a particular social group means membership in a group of people all of whom share a common, immutable characteristic, that is, a characteristic that is either beyond the power of the individual members to change or that is so fundamental to their identities or consciences that it should not be required to be changed.

     The respondent's argument that the alien smugglers will harm him because of his status as a member of a particular social group of juvenile informants lacks merit. If an alien smuggling ring seeks to harm the respondent, it is not on account of his membership in a particular social group, but rather for retribution for his actions in testifying against four smugglers. However, aliens fearing retribution over personal matters do not qualify for asylum under one the protected grounds. There is no evidence in the record that the over 50 smuggling rings attempt to harm all informers or witnesses, or just those which harmed their particular enterprise. Thus, the respondent has failed to show that as an informer, he shares a "common" characteristic with other informers or witnesses, in that it appears that his actions only harmed a particular smuggling ring. This ring, or the associates of the four smugglers convicted, would have no motivation to seek retribution on other informers, since each act of whistleblowing or testimony is unique circumstance that affects, at most, one ring. Further, the respondent does not offer any evidence that other juvenile informers of this particular smuggling ring, or any ring, exist or fear reprisals. Since the motivation for any harm towards the respondent appears to be the result of his personal actions, not his group membership, he failed to establish a nexus to a particular social or any other protected ground.

---

[1]The BIA noted that Hong did not appeal the IJ's decisions regarding withholding of removal and protection under the Convention Against Torture Act, and Hong does not question the BIA's refusal to consider these issues in his appeal to this Court.

App. at 3-4 (citations omitted).  We do not read the BIA's opinion as rejecting any of the facts found by the IJ.

II.

In order to be eligible for asylum, an alien must establish that he is a "refugee" under 8 U.S.C. § 1101(a)(42)(A).  *Abdille v. Ashcroft*, 242 F.3d 477, 482 (3d Cir. 2001). A "refugee" is:

> any person who is outside any country of such person's nationality . . .  and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . .

8 U.S.C. § 1101(a)(42)(A).

The only statutory term in contention here is "membership in a particular social group."  This statutory language itself is "not very instructive":

> Read in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a "particular social group."

*Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993).  There is no helpful evidence of legislative intent and "[b]oth courts and commentators have struggled to define" the phrase.  *Id.* at 1238-39.  Thus, the "contours of what constitutes a 'particular social group' are difficult to discern."  *Lukwago v. Ashcroft,* 329 F.3d 157, 170 (3d Cir. 2003). *See also* 3 Charles Gordon, Stanley Mailman & Stephen Yale-Loehr, *Immigration Law and Procedure* § 33.04(2)(d)(i) (rev. ed. 2005) ("Its scope has been debated, thus far

6

inconclusively . . . . A clearer picture doubtless will be developed in case-by-case

litigation.").

The principal decision in which the BIA has attempted to define "particular social

group" is *Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985), a decision on which

we have had repeated occasion to rely. *See, e.g., Fatin*, 12 F.3d at 1239; *Lukwago*, 329

F.2d at 171. *See also* Gordon, Mailman & Yale-Loehr, *supra* at § 33.04(2)(d)(i). In

*Matter of Acosta*, the BIA declared:

> [W]e interpret the phrase "persecution on account of membership in a
> particular social group" to mean persecution that is directed toward an
> individual who is a member of a group of persons all of whom share a
> common, immutable characteristic. The shared characteristic might be an
> innate one such as sex, color, or kinship ties, or in some circumstances it
> might be a shared past experience such as former military leadership or land
> ownership. The particular kind of group characteristic that will qualify
> under this construction remains to be determined on a case-by-case basis.
> However, whatever the common characteristic that defines the group, it
> must be one that the members of the group either cannot change, or should
> not be required to change because it is fundamental to their individual
> identities or consciences. Only when this is the case does the mere fact of
> group membership become something comparable to the other four grounds
> of persecution under the Act, namely, something that either is beyond the
> power of an individual to change or that is so fundamental to his identity or
> conscience that it ought not be required to be changed. By construing
> "persecution on account of membership in a particular social group" in this
> manner, we preserve the concept that refuge is restricted to individuals who
> are either unable by their own actions, or as a matter of conscience should
> not be required, to avoid persecution.

*Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985) *overruled in part by INS v.*

*Cardoza Fonesca*, 480 U.S. 420 (1987) *as recognized by Matter of Mogharrabi*, 19 I. &

7

N. Dec. 439 (BIA 1987) (emphasis supplied).[2]

We have interpreted *Matter of Acosta* as requiring the asylum seeker to "(1) identify a group that constitutes a 'particular social group' within the [BIA's] interpretation . . . (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership." *Fatin*, 12 F.3d at 1240.

We defer to the BIA's interpretation of statutory terms in the Refugee Act such as "particular social group" pursuant to the standards set out in *Chevron U.S.A., Inc. v. National Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984). *See Fatin*, 12 F.3d at 1239; *Lukwago*, 329 F.3d at 171. However, the BIA may not depart from existing precedent "without announcing a principled reason for the departure." *Amafi v. Ashcroft*, 328 F.3d 719, 728 (3d Cir. 2003). We do not supply our own reasoning for the results reached by the BIA as "[i]t is a bedrock principle of administrative law that judicial review of an agency's decision is limited to the rationale that the agency provides." *Konan v. Attorney General of the United States*, 432 F.3d 497, 501 (3d Cir. 2005) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Hong relies heavily on *Lukwago v. Ashcroft,* 329 F.3d 157 (3d Cir. 2003). In *Lukwago*, our Court found that fear of future persecution was a viable theory of asylum for a Ugandan child who was abducted and forced into military service by a rebel group,

---

[2] The quoted portion of *Matter of Acosta* remains good law. *See Fatin*, 12 F.3d at 1240 n.9.

the Lord's Resistant Army. *Id.* at 178. The Court found that the government had provided "no persuasive reason" why "particular social group" could not be interpreted to include "former child soldiers who have escaped LRA enslavement." *Id.* The *Lukwago* Court found that this group fit within the BIA's recognition in *Matter of Acosta* that shared experience "such as former military experience" could form the basis for immutable characteristics by which a social group could be defined. *Id.*

The *Lukwago* Court, however, rejected Lukwago's argument that he could be eligible for asylum based on *past persecution* on account of his membership in the same group. *Id.* at 172, 178. Lukwago, the Court found, could not claim that he had suffered persecution because he was a former child soldier:

> We agree that under the statute a "particular social group" must exist independently of the persecution suffered by the applicant for asylum. Although the shared experience of enduring past persecution may, under some circumstances, support defining a "particular social group" for purposes of fear of future persecution, it does not support defining a "particular social group" for past persecution because the persecution must have been "on account of" a protected ground. Therefore, the "particular social group" must have existed before the persecution began.

*Id.* at 172. This reasoning means that defining a "particular social group" solely by persecution obviates the requirement that the alien establish that they suffered persecution "on account of" their membership in a group – essentially, "I was persecuted on account of my membership in a group that was persecuted" is not a valid asylum claim.

Hong argues that, in accordance with *Matter of Acosta*, he is a member of a "particular social group" based on his past experience of offering testimony against the

9

Snakeheads. In accordance with *Lukwago*, Hong argues that he can ground his fear of future persecution in his membership in this group. Hong claims that this experience is immutable, now, since he cannot change the fact that he cooperated with the authorities. *See Lukwago*, 329 F.3d at 178 ("His status as a former child soldier is a characteristic he cannot change and one that is now, unfortunately, fundamental to his identity."). The fact that the persecution he fears is arguably retaliation for conduct he voluntarily undertook should not diminish his claim, according to Hong, since we found in *Lukwago* that the fear of persecution was based in part on evidence that "the LRA . . . engages in retaliatory conduct to punish children who have successfully escaped." *Id.* at 179. The fact that Hong voluntarily undertook the conduct that made him a member of this group also does not distinguish his case from *Lukwago*, in Hong's view, as the child in that case also voluntarily acted by escaping from slavery, knowing of the retaliation the LRA might exact if he were successful. Also like *Lukwago*, the government arguably has not offered a "persuasive reason" for its construction of the statute to exclude Hong's proffered social group. *See id.* at 178 ("The INS has offered no persuasive reason why a 'particular social group' under the INA may not consist of former child soldiers who have escaped LRA enslavement.").

## III.

We find ourselves uncertain of the grounds upon which the BIA rested its reversal of the IJ decision and, accordingly, unable to carry out our responsibility of determining

10

whether it represents a rational application of existing precedent. In particular, it is unclear to us whether the BIA's decision rested on a finding that Hong had failed the first or the third prong of the test we suggested in *Fatin* – whether Hong failed to "identify a group that constitutes a 'particular social group'" under 8 U.S.C. § 1101(a)(42)(A) or whether he failed to "show that he or she would be persecuted or has a well-founded fear of persecution based on that membership." *See Fatin*, 12 F.3d at 1240. For this reason and because it appears to us that a grant of asylum in this case might have important consequences for the implementation of our national immigration policy, we find it prudent to remand this case to the BIA for a fuller explanation of its views on the issues raised here. *Cf. Abdulai v. Ashcroft*, 239 F.3d 542, 555 (3d Cir. 2001) (remanding because the BIA "never explain[ed] . . . what *particular* aspects of [the asylum seeker's] testimony it would have been reasonable to expect him to have corroborated" so that the decision would be consistent with BIA precedent and the "BIA's failure of explanation makes it impossible for us to review its rationale"). (Emphasis in original.)

First, we note that the first-quoted paragraph of the BIA's decision can be read to express its disagreement with the proposition that juvenile informants on smuggling rings in general or on the Snakeheads in particular can constitute a "particular social group." On the other hand, in the context of the second paragraph it need not be read in that fashion.

The BIA's primary rationale for its ultimate conclusion here appears to be

11

reflected in the following text from its opinion:

> If an alien smuggling ring seeks to harm the respondent, it is not on account of his membership in a particular social group, but rather from retribution for his actions in testifying against four smugglers. . . . There is no evidence in the record that the over 50 smuggling rings attempt to harm all informers or witnesses, or just those which harmed their particular enterprise. Thus, the respondent has failed to show that as an informer, he shares a "common" characteristic with other informers or witnesses, in that it appears that his actions only harmed a particular smuggling ring. This ring, or the associates of the four smugglers convicted, would have no motivation to seek retribution on other informers, since each act of whistleblowing or testimony is unique circumstance that affects, at most, one ring.

App. at 4 (citations omitted).

The gist of the BIA response to the IJ decision is that there is no showing of a nexus between the fear of persecution found by the IJ to be an objective one and membership in the claimed social group because smuggling rings, of which there are many, are likely to retaliate only against informants who testify against members of their immediate ring and not against those who inform against members of other rings. It apparently followed, in the BIA's view, that if the Snakeheads harmed Hong it would not be because he was a member of "a particular social group" consisting of "*juvenile informants against international smuggling rings*." (Emphasis supplied.)

We find this analysis less than satisfying because it seems clear to us from her opinion that the "particular social group" the IJ had in mind consisted of *juveniles who informed on a particular gang, i.e., the Snakeheads*. Her finding had to do with Hong's fear that he would be detained on his return to China and would there be subject to

12

retaliation by the Snakeheads for having testified against them.[3]  The motive of the

---

[3]The IJ found, *inter alia*,

> [H]ere we have a juvenile who informed on a criminal gang.

> And basically, the snake heads are a major criminal organization, equivalent to the mafia or to the Russian gang in the United States.  We have a juvenile who informed on a criminal gang.  It is his subjective belief that these people are powerful enough that they will contact people in China, or that they will make people in China aware that he has informed on them.  And that he would, in fact, be harmed if he returned to China because of his activities of informing on these criminals.

> There is sufficient information in these materials submitted in Exhibit 8 to find that the snake heads are indeed a powerful criminal gang operating internationally, that they are capable of bribing and corrupting officials in People's Republic of China, as well as officials in other countries.

> * * *

> Does he have a subjective fear of returning, the Court finds that he has a subjective fear.  In looking at the information contained in Exhibit 8, it is based on objective, if there is an objective bases because there were enough information in these articles to show that these shake heads have contacts, have influence, and the government of China cannot control their activities.

> * * *

> Accordingly, the Court finds that while the respondent has not suffered past persecution, he would suffer future persecution because he is a person or juvenile who testified against snake heads who have great influence in the Chinese government, who are capable of leeching people and harming them, and the Chinese government cannot control this type of activity.

App. at 21-22; App. at 24.

13

Snakeheads if that occurred would have a nexus to a "particular social group," consisting of juvenile informants against the Snakeheads.

In addition to this lack of nexus point, however, it seems to us that the BIA may have had a third basis for its ultimate conclusion. The BIA appears to be drawing a distinction between "retribution over personal matters" and retribution for group membership. If this is the case, we also find this explanation unsatisfying in the context of BIA case law and Third Circuit case law which recognizes that the common immutable characteristic of "a particular social group" may be a common past experience. As we have noted, the BIA in *Matter of Acosta* recognized that a "shared past experience such as former military leadership or land ownership" could be the kind of shared characteristic on which a protected social group could be based. *Matter of Acosta*, 19 I. & N. Dec. at 233. In *Matter of Fuentes*, 19 I. & N. Dec. 658, 662 (BIA 1988), it recognized that those formerly serving in the El Salvadoran national police could be a protected social group under the asylum statute. In *In re Fauziya Kasinga*, 21 I. & N. Dec. 357 (BIA 1996), the BIA found that young women not yet subjected to, and opposing the practice of, female genital mutilation by their tribe were a particular social group. If the distinction between "personal matters" and non-personal matters is the basis for the BIA's decision, it is unclear why these experiences are not "personal matters" while testifying against criminals is. As *Lukwago* illustrates, common past experience of groups so defined will frequently be "personal matters" resulting at least in part from personal decision making.

14

We realize that the BIA in *Matter of Acosta* did not hold that all past experiences qualify as common characteristics appropriate for defining a social group. It recognized only that "shared past experience" may be used "in some circumstances," noting that the "particular kind of group characteristic that will qualify under this construction remains to be determined on a case by case basis." *Matter of Acosta*, however, does recognize that certain past experiences form the basis for protected group status under the asylum statute, and other BIA precedents have recognized such protection for some experiential-based groups offered by asylum seekers. *See, e.g., Matter of Fuentes*, 19 I. & N. Dec. at 662; *In re Fauziya Kasinga*, 21 I. & N. Dec. 357 (1996). To the extent that the BIA now departs from precedent, it owes Hong a "principled reason" for why it has chosen to interpret "particular social group" so as not to include the group he has proffered. *See Amafi*, 328 F.3d at 728. We can perform our statutorily imposed review responsibility only if we are provided with an explanation of the basis for the BIA conclusion in a particular case that enables us to judge its consistency with Board and judicial precedent. We are not satisfied that we have such an explanation here.[4]

_____

[4]We note that we are also puzzled by the BIA's comment that there is no "evidence that other juvenile informers of this particular smuggling ring, or any ring, exist or fear reprisals." First, there clearly is evidence that there were other informers against the Snakeheads, and that evidence certainly suggests that prosecutors of other smuggling rings must have solicited similar aid. While the record is silent with regard to the age of other informants, we fail to perceive the importance of the addition of "juvenile" to the description of the "particular social group." Finally, with respect to the fear of other informants, the BIA did not disturb the IJ's factual findings regarding the access of Snakeheads to Chinese detention centers. *See supra* note 2. Accepting those findings, there would appear to be the same basis for concluding that other informers on the

15

The issue here posed is a sensitive one that should not be resolved without the benefit of the expertise of the Agency. As we have noted, once "shared personal experience" is recognized as a legitimate immutable characteristic for purposes of defining "a particular social group," the limits of that principle are not easy to limit. *See Escobar v. Gonzalez*, 417 F.3d 363 (3d Cir. 2005). Whether or not it extends to a situation in which the shared experience is conduct voluntarily undertaken after entry into the United States seems to us a question that may have important implications for the implementation of our national immigration policy.[5] We hold only that the BIA opinion in this case failed to provide a principled reason for the conclusion it reached.

The petition for review will be granted, and this matter will be remanded to the BIA for further proceedings consistent with this opinion.

---

Snakeheads shared the same objectively reasonable fears that Hong was found to have.

[5]We also note that this is a situation which Congress has addressed in another segment of the Immigration and Nationality Act. Aliens in Hong's situation have another avenue for relief, an avenue Hong unsuccessfully pursued – obtaining an S-Visa from the prosecutor who uses their testimony. Congress has specifically delimited such grants to those witnesses who offer "critical reliable information" concerning a "criminal organization or enterprise" and who are "essential to the success of" an investigation or prosecution of that enterprise. *See* 8 U.S.C. § 1101(a)(15)(S)(i); 8 C.F.R. § 214.2(t)(i)-(iii).