Jose Godofredo **UCELO–GOMEZ** and Ana Mariela Espana– Espinosa, Petitioners,

v.

Alberto **GONZALES**, Attorney General,* Respondent.

Docket Nos. 04–4184–ag(L), 04–4185–ag(CON).

United States Court of Appeals, Second Circuit.

Argued: April 21, 2006.

Decided: May 9, 2006.

Amended: Sept. 28, 2006.

---

* Pursuant to Rule 43(c)(2), Fed. R.App. P., Attorney General Alberto Gonzales is substituted for his predecessor, Attorney General John Ashcroft, as respondent in this case.

164

Roberto Tschudin Lucheme, Glastonbury, CT, for Petitioners.

Lisette M. Reid, Assistant United States Attorney (R. Alexander Acosta, United States Attorney for the Southern District of Florida, of counsel; Anne R. Schultz, Chief, Appellate Division, and Laura Thomas Rivero, Assistant United States Attorney, on the brief), Miami, FL, for Respondent.

Before WALKER, Chief Judge, JACOBS and WALLACE, Circuit Judges.**

PER CURIAM.

Petitioners Jose Godofredo Ucelo–Gomez and Ana Mariela Espana–Espinosa

** The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

(husband and wife) are natives and citizens of Guatemala, who challenge a decision by the Board of Immigration Appeals ("BIA") that summarily affirmed the oral decision of an immigration judge ("IJ") that (1) denied their applications for asylum and withholding of removal under the Immigration and Naturalization Act ("INA") and their applications for protection under the Convention Against Torture ("CAT"), and (2) directed their removal to Guatemala. Their asylum claim is based on membership in a social group composed of affluent Guatemalans, who suffer persecution fueled by class rivalry in an impoverished society.

The BIA summarily affirmed the IJ's determination that affluent Guatemalans do not constitute a social group for purposes of asylum. Because the affirmance was summary, there is no agency determination on the protectibility of that particular group. *See Shi Liang Lin v. DOJ*, 416 F.3d 184, 189–90 (2d Cir.2005). We conclude that we cannot review the IJ's determination of the matter in the first instance. *See Gonzales v. Thomas,* —— U.S. ——, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006) *(per curiam).* We therefore grant the petition, vacate the BIA's order, and remand to the BIA to determine whether the facts as found support a determination that the aforementioned group of persons constitutes a social group within the meaning of the INA.

## BACKGROUND

Mr. Ucelo–Gomez and Ms. Espana–Espinosa married in February 1996, and entered the United States in August 2001 using forged travel visas and false names. The couple subsequently pled guilty to attempted illegal entry with counterfeit documents and each paid a $3,000 fine. Petitioners have conceded their removability.

In their airport statements: (1) Ucelo–Gomez said that he left Guatemala to "look for work"; (2) Espana–Espinosa said that she left Guatemala "to visit [her] uncle in Los Angeles, California"; and (3) both said they had no "fear or concern about being returned to [Guatemala] or being removed from the United States" and would not be harmed if returned to Guatemala.

Taking a different tack in her petition, Espana–Espinosa states that her sister was kidnapped by an "organized political gang[ ]" in December 1996, shot in the leg, and released in January 1997; that the captors threatened petitioners, causing them "to continually change [their] location" and to seek refuge in the United States; and that she fears that on return she would be "harassed and threatened" or "kidnapped, physically harmed, even killed" because of "class hatred" harbored by the same political gangs that abducted her sister.[3]

At the January 2, 2003 hearing before the IJ, petitioners (through counsel) premised their asylum claim on persecution by reason of membership in a particular social group composed of "higher socio-economic" Guatemalans. Specifically, Espana–Espinosa testified as follows:

- She came from a well-off family; she and her husband had a good life in Guatemala; they own a house that is presently rented out; the couple employed a housekeeper; and she attended college and obtained a teacher's degree.

---

**3.** Espana–Espinosa also lists an affiliation with the Partido Avanzada Nacional party, but she nowhere indicates that there is any nexus between her political affiliation and her claim of persecution, and concedes that neither she nor her husband had any political involvement.

- In December 1996, the couple received anonymous phone calls demanding ransom for the release of Espana–Espinosa's sister, and threatening that, unless the ransom was paid, they would face the same fate.
- By reason of telephonic and written threats, petitioners moved (in October 1998) to another town in Guatemala but the threats resumed several months later, forcing them to move once more.
- After their final relocation, petitioners were unemployed and subsisted off savings and investment income.
- Espana–Espinosa twice reported the threats to the police, to no apparent effect.
- The couple never paid her sister's ransom, but the sister was released by her captors after they "saw her wounded in her leg."

Espana–Espinosa conceded on cross-examination that her airport statement denied any fear about returning to Guatemala, and asserted that the denial was untruthful and was made only because she feared that otherwise she would be jailed in the United States. She also acknowledged that her wealthy uncle in Guatemala (not so rich as herself) has never been threatened.

Ucelo–Gomez's testimony at the hearing corroborated much of his wife's story, adding that he drew income from a discotheque and a carpentry workshop that employed two people, and that he could likely have supported his family on his income had they remained in Guatemala. Ucelo–Gomez testified that the couple came to the United States for non-economic reasons, but conceded on cross-examination that his father was also "rich," and that none of his relatives (including his father) had ever been threatened for any reason.

In an oral decision, the IJ denied petitioners' applications on the ground that they failed to establish past persecution under 8 C.F.R. § 208.13(b)(1). The IJ ruled that receiving a ransom demand from unknown persons does not constitute persecution, and that petitioners had proffered no evidence that these threats resulted, or would have resulted, in any harm. Alternatively, the IJ concluded that, even if petitioners had suffered persecution, it was not on account of their race, religion, nationality, membership in a particular social group, or political opinion. The IJ held that a group made up of affluent Guatemalans was not a "readily-identifiable social group" and was "too broad to define a social group for purposes of asylum." He concluded that the characteristics of that "group" are not immutable, and there was insufficient evidence that similarly-situated Guatemalans would be identified by would-be persecutors.

The IJ also found petitioners' stories not credible, citing inconsistencies between their airport statements and their testimony at the asylum hearing. In addition, the IJ found that petitioners failed to establish a well-founded fear of future persecution under 8 C.F.R. § 208.13(b)(2), because nothing in the admitted background materials or country reports indicated that wealthy Guatemalans "are specifically targeted for persecution." Because petitioners failed to demonstrate the requisite well-founded fear, the IJ ruled that they failed to meet the clear probability standard required for withholding of removal under § 241(b)(3) of the INA. Finally, the IJ concluded that their CAT claim was baseless because they had no fear of any actions against them by the government of Guatemala. Accordingly, the IJ ordered petitioners removed to Guatemala.

The BIA affirmed without opinion.

## DISCUSSION[4]

### I

■ When the BIA affirms without opinion, we review the IJ's decision as the final agency determination. *See Twum v. INS*, 411 F.3d 54, 58 (2d Cir.2005). We review the IJ's factual findings under the substantial evidence standard, which is met "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B); *see Ramsameachire v. Ashcroft*, 357 F.3d 169, 177 (2d Cir.2004); *see also Cao He Lin v. DOJ*, 428 F.3d 391, 401 (2d Cir.2005); *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir.2004).

■ We typically afford "particular deference" to an IJ's credibility finding, "mindful that the law must entrust some official with responsibility to hear an applicant's asylum claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant." *Zhou Yun Zhang*, 386 F.3d at 73 (internal quotation marks omitted). Our review of a credibility finding is to ensure that it is "based upon neither a misstatement of the facts in the record nor bald speculation or caprice." *Id.* at 74; *see also Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003) (explaining that an adverse credibility finding must be based on "specific, cogent reasons" that "bear a legitimate nexus" to the applicant's credibility) (internal quotation marks omitted).

■ Here, the adverse credibility finding is arguably infirm and, in any event, of limited influence and effect in the context of this petition. First, the IJ failed to consider Espana–Espinosa's testimony that the kidnappers threatened petitioners with being kidnapped themselves if they failed (as they did) to pay the ransom, and that their complaints to the police were unavailing. Second, the IJ cited differences between the petitioners' airport statements and their testimony, but did not evaluate Espana–Espinosa's explanation that she feared being jailed in the United States if she expressed any fear about being returned to Guatemala. These omissions might themselves support a remand, *see Cao He Lin*, 428 F.3d at 400; *Secaida–Rosales*, 331 F.3d at 307; but there is a more fundamental problem with the adverse credibility finding. As explained in the following Part of this Opinion, we do not know which (if any) of the facts alleged by petitioners would suffice to confer status as members of a social group protected from persecution by the INA. Without knowing that, we cannot very well assess the impact of the adverse credibility finding on their claim, or whether (or how) the finding bears upon matters that go to the heart of such a claim. *See Ramsameachire*, 357 F.3d at 178 ("[T]he fact that the [IJ] has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review."); *accord Secaida–Rosales*, 331 F.3d at 307.

### II

Does a given group of persons qualify as a "particular social group," such that that group of persons is protected under the INA? Here, petitioners assert that they fear persecution in their native Guatemala because of their membership in a group composed of affluent Guatemalans, a group

---

4. Judge Wallace concurs in the Background section and Part II of the Discussion section of the Opinion, and in the result, but does not reach or decide (1) whether there is a suffi- cient showing of persecution or (2) issues that bear upon the adverse credibility determination.

that the BIA has never recognized; the BIA's summary affirmance provides this Court no categorical guidance on that point. The question presented on this appeal is whether we should determine—absent explicit guidance from the BIA in the first instance—that this group of persons is a "particular social group" protectible under the INA.

#### A

■■ Agency interpretations are accorded *Chevron* deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, *and* that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (emphasis supplied); *see also Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "[I]t is beyond cavil that Congress has, as a general matter, delegated the authority to make immigration rules carrying the force of law; the INA, after all, unambiguously vests such power in the Attorney General, among others." *Shi Liang Lin v. DOJ*, 416 F.3d 184, 189 (2d Cir.2005) (collecting statutes and cases).

In *Shi Liang Lin v. DOJ*, we declined to accord *Chevron* deference to "any statutory construction of the INA set forth in a summarily affirmed IJ opinion." *Id.* at 191. There, we withheld *Chevron* deference from a one-line disposition by the BIA because (1) in such a summary affirmance, the BIA has laid down no "rule" carrying the force of law and promulgated in the exercise of the Attorney General's authority, and (2) the IJ would be improperly delegated rule-making authority delegated only to the BIA. *Id.* at 189–90. "[W]ere we to accord *Chevron* deference to non-binding IJ statutory interpretations,

we could find ourselves in the impossible position of having to uphold as reasonable on Tuesday one construction that is completely antithetical to another construction we had affirmed as reasonable the Monday before." *Id.* at 190. Accordingly, we remanded that petition to the BIA.

Our reasoning in *Shi Liang Lin* anticipated the Supreme Court's very recent opinion in *Gonzales v. Thomas*, —— U.S. ——, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006) *(per curiam)*, which addressed whether an appellate court ought to consider (in the first instance) whether a given group of persons falls within the statutory term "particular social group" under INA § 101(a)(42)(A), where the agency has not formally considered that question, *see id.* at 1614. In *Thomas*, Michelle Thomas and her immediate family applied for asylum, claiming that they feared persecution in the Republic of South Africa "because of their race (they are white) and their kinship with Michelle's father-in-law, 'Boss Ronnie,' a white South African who allegedly held racist views and mistreated black workers at the company at which he was a foreman." *Id.* The IJ focused on race and political views and denied the claim. The BIA summarily affirmed the IJ, *see id.*, but a panel of the Ninth Circuit granted the petition for review (2–1) on the ground that the agency inadequately considered whether the Thomas family was a "particular social group," *Thomas v. Ashcroft*, 359 F.3d 1169, 1178–79 (9th Cir. 2004). The Ninth Circuit took the case *in banc*, concluding (7–4) that "a family *may* constitute a social group for the purposes of refugee statutes," *see Thomas v. Ashcroft*, 409 F.3d 1177, 1187 (9th Cir.2005) *(in banc)* (emphasis supplied), and that the "Thomases were attacked and threatened because they belong[ed] to the particular social group of 'persons related to Boss

Ronnie,'" *id.* at 1189 (internal quotation marks omitted).

The Supreme Court reversed the Ninth Circuit in a unanimous *per curiam* opinion. The Court held that the appellate court had usurped the agency's administrative role by making "the basic asylum eligibility decisions." *Thomas*, 126 S.Ct. at 1615 (citation and quotation marks omitted). The agency had yet to consider whether "Boss Ronnie's family present the kind of kinship ties that constitute a particular social group." *Id.* (internal quotation marks omitted). The Ninth Circuit therefore erred by deciding that question in the first instance: " 'A court of appeals "is generally not empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." ' " *Id.* (quoting *INS v. Orlando Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) *(per curiam)* (in turn quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))). The Court therefore vacated and remanded, laying down the rule that, absent "special circumstances" not present in that case, *see id.*, the agency must first opine on issues about which it has expertise prior to appellate review.

 *Thomas* relies on an elementary precept of administrative law: "judicial judgment cannot be made to do service for an administrative judgment." *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (quoted in *Thomas*, 126 S.Ct. at 1615); *see also Chenery*, 318 U.S. at 88, 63 S.Ct. 454 ("[A]n appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency."). So, where (as here) the agency has yet to decide whether a group, a thing, or a situation falls within the ambit of a statutory term, the proper course is for the reviewing court to remand the matter to the agency in accordance with the well-worn "ordinary 'remand' rule":

> The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides.

*Thomas*, 126 S.Ct. at 1615 (quoting *Ventura*, 537 U.S. at 17, 123 S.Ct. 353). "[A] court's role in an immigration case is typically one of 'review, not first review.'" *Thomas*, 126 S.Ct. at 1614 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)).

Furthermore, the agency interpretation required by *Thomas* and *Ventura* is "in the first instance" a particularized interpretation by *the agency*. Interpretations by individual IJs are insufficient to constitute the agency's interpretations; the procedural posture of the Supreme Court's opinion in *Ventura* (on which *Thomas* heavily relies) makes this clear. In *Ventura*, the Court remanded the question of changed country conditions in Guatemala to the BIA *even though the individual IJ had considered and decided the issue. See* 537 U.S. at 15, 17, 123 S.Ct. 353 (noting the IJ's finding, but holding that the court of appeals "committed clear error" by deciding the case "without giving *the BIA* the opportunity to address the matter in the first instance in light of its own expertise" (emphasis supplied)).

 Moreover, while the instant case (unlike *Ventura*) involves a summary affirmance, it is well-settled (as discussed above, *see ante* [167 – 168] that the BIA's summary affirmance of an IJ's decision does *not* constitute an official agency interpretation. *See Shi Liang Lin*, 416 F.3d at 189–90; *cf. Mead*, 533 U.S. at 233, 121

S.Ct. 2164 ("[A]ny suggestion that rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's 46 scattered offices is simply self-refuting."). Thus, interpretations by individual IJs, even if summarily affirmed by the BIA, are not sufficient to constitute the agency's interpretation.

The BIA has not decided whether affluent Guatemalans constitute a "particular social group" within the meaning of the INA. Nor has the BIA decided the scope of the statutory term in a fact context sufficiently analogous to those presented here that we can rule now with assured confidence that petitioners are or are not part of a particular social group. Because there is no basic asylum eligibility decision[ ] by the BIA, we remand. *Cf. Thomas,* 126 S.Ct. at 1615 (" 'Within broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question.' " (quoting *Ventura,* 537 U.S. at 16, 123 S.Ct. 353)).

When we remand because the BIA has not yet spoken with sufficient clarity, it will often be up to the BIA to decide whether to issue a precedential or non-precedential opinion. And where the former is the case, we (of course) must grant the BIA's responsive opinion *Chevron* deference, assuming the basic requirements of *Chevron* are met. *See Nat'l Cable & Telecomm. Assoc. v. Brand X Internet Serv.,* 545 U.S. 967, 125 S.Ct. 2688, 2700–01, 162 L.Ed.2d 820 (2005); *see also Yuanliang Liu v. United States DOJ,* 455 F.3d 106, 117 (2d Cir.2006) (citing *Brand X* for the proposition that *Brand X* holds that "that a court's earlier construction of a statute trumps an agency's more recent construction only if the original interpretation by the federal court was thought to be premised on the unambiguous terms of the statute"); *Sash v. Zenk,* 439 F.3d 61, 67 n. 6 (2d Cir.2006) ("We find only that where an agency gives clear notice of the meaning of a statute by regulation, and where it is reasonable to charge defendants with notice of the agency's interpretation, Chevron deference will apply prior to the rule of lenity.").[5]

At the same time, we do not intend to establish a *per se* rule; thus if a reviewing court can state with assured confidence (absent agency guidance as to its protectability under the INA) that a group would or would not under any reasonable scenario qualify as a "particular social group," it need not remand, and may rule on the issue in the first instance. This option is not available in this case because the IJ made no factual finding as to petitioners' wealth or status; so no case-specific determination is possible.

**B**

The result mandated in this case by *Thomas* is consistent with our remand to

---

5. In *Brand X*, the Supreme Court considered whether a prior judicial interpretation of a statute can trump an implementing agency's later contrary interpretation in order to clear up the "genuine confusion in the lower courts over the interaction between the *Chevron* doctrine and *stare decisis* principles." *Id.* at 2702. Justice Thomas (writing for a majority of six) stated that the Ninth Circuit erred in assuming its prior construction of the Act at issue overrode the FCC's, because "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 2700. If the contrary rule prevailed, the ability of Congress to delegate successfully to an agency would be made to depend on whether the agency's construction preceded a court's construction; and that would "lead to the ossification of large portions of our statutory law by precluding agencies from revising unwise judicial constructions of ambiguous statutes." *Id.* at 2700–01 (internal quotations and citation omitted).

the BIA in *Shi Liang Lin v. DOJ*, 416 F.3d 184 (2d Cir.2005), which directed the BIA (1) to explain its rationale for construing § 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to provide that the "forced sterilization of one spouse on account of a ground protected under the Act is an act of persecution against the other spouse and that, as a result, the spouses of those directly victimized by coercive family planning policies are *per se* as eligible for asylum as those directly victimized themselves"; and (2) to "clarify whether, when, and why boyfriends and fiances may or may not similarly qualify as refugees pursuant to IIRIRA § 601(a)." *Id.* at 192 (internal quotation marks and citation omitted).

Though our conclusion in *Shi Liang Lin* was driven by the BIA's failure to "identify the specific statutory language pursuant to which it deemed spouses eligible for asylum under IIRIRA § 601(a), [or] ... to explain the reasoning motivating its chosen construction," *id.* at 191, our reasoning was premised on our desire to review (and afford appropriate deference to) well-reasoned agency decisions, *see id.* Thus, whether or not the agency has articulated a coherent interpretation of a statutory term is of no moment where the agency's opinion fails to provide a reviewing court sufficient direction.

To date, the BIA's guidance as to what constitutes a "particular social group" has grown (essentially) out of its opinion in *Matter of Acosta*, 19 I. & N. 211 (BIA 1985), in which the agency announced some general principles for the interpretation of the statutory term:

> Applying the doctrine of ejusdem generis, we interpret the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share *a common, immutable characteristic*. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership.... [W]hatever the common characteristic that defines the group, it must be one that the members of the group either *cannot change*, or *should not be required to change* because it is fundamental to their individual identities or consciences.

*Id.* at 233 (emphasis supplied); *accord Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991) (holding that a social group must be recognizable and discrete, allowing would-be persecutors to identify victims as members of the purported group). *Acosta* holds that the characteristics associated with a "particular social group" must be (1) common, (2) immutable, (3) innate, and (4) unchangeable. This definition is not unhelpful, but it is general and its application does not reliably control particular instances, leading to a wellspring of differing (and often irreconcilable) interpretations by different courts of appeals. This is especially true because the BIA rarely states whether or not a *particular* group is protectible under the INA—*i.e.,* application of the *Acosta* principles by the agency has been sporadic, non-specific, and unhelpful. *See, e.g., Matter of Odibi*, 21 Immig. Rptr. B1–257 (BIA 2000) (indicating only in *dicta* that homosexuals in Nigeria may constitute a protected group); *Matter of X*, 22 Immig. Rptr. B1–123 (BIA 1998) (Index Dec.) (stating only in *dicta* that deaf people in Thailand might constitute a social group within the meaning of the INA); *Matter of Fuentes*, 19 I. & N. Dec. 658, 662 (BIA 1988) (recognizing that former members of the Salvadoran national police could constitute a particular social group, but finding insufficient evidence of future

danger); *but see, e.g., In re Fauziya Kasinga,* 21 I. & N. Dec. 357, 358 (BIA 1996) (recognizing as a particular social group "young women of the Tchamba–Kunsuntu Tribe who have not had [female genital mutilation], as practiced by that tribe, and who oppose the practice"); *Matter of Toboso–Alfonso,* 20 I. & N. Dec. 819, 822 (BIA 1990) (recognizing Cuban homosexuals as a particular social group). *Acosta* is a start, but insufficient to meet the purposes of appellate review. *Thomas* demands more.

Our mandate serves the convenience of the BIA as well as this Court, and promotes the purposes of the INA. *Thomas* requires that we (in effect) certify this question. There is a press of cases raising similar questions in this Court, in the BIA, and before immigration judges; and the common project of deciding asylum cases promptly will be advanced by prompt guidance. We assume that in light of *Thomas,* the BIA will discharge its singular responsibility to expand upon *Acosta,* and to recognize and define social groups with particularity and to reject proposed groups (on an active and ongoing basis in the first instance) in order to avoid the ping-pong effect of a summary affirmance followed by a remand—a pattern that serves no one and squanders judicial resources. The BIA's prompt consideration and decision is therefore essential. Accordingly, we impose a time limit for the BIA's decision of the question posed on remand.

## CONCLUSION

For the foregoing reasons, we hereby grant the petition, vacate the BIA's order, and remand to the BIA for further proceedings consistent with this opinion. The BIA is hereby directed to issue its responsive opinion *within 49 days,* and it is reminded that the Court has received no response to its similar request in *Shi*

*Liang Lin* (mandate issued October 12, 2005). This panel retains jurisdiction to rule upon the instant petition and decide the issues on appeal following the disposition of the remand. *See Shi Liang Lin,* 416 F.3d at 192; *United States v. Jacobson,* 15 F.3d 19, 21–22 (2d Cir.1994).

Judge WALLACE concurs only in the Background and Part II of the Discussion, and in the result.